The next case on for argument is Washington Sunday Players, Inc. v. Kellwood Company. I think that podium comes up a little bit if you would like that. Thank you, Your Honor. May it please the Court. My name is Douglas Cauley of the firm of McCool Smith, and I am here today representing the appellant, Mr. Washington, and Sunday Players. At the very beginning of my argument this morning, I would like to clarify the relief that is being sought today by the appellant. We ask today that the Court find that the trial court's JMOL, striking the jury's finding of lost profit damages, be found to be erroneous. If the Court so finds, we then request that the Court reverse and render for damages as to the jury's finding of lost profits, plus prejudgment interest. If the Court grants that relief, then the appellant does not seek a new trial on any other ground of error. If, on the other hand, the Court declines to enter that relief, then in the alternative, the appellant seeks a new trial on damages, both lost profits and loss of business value. The Court's action below in granting JMOL, striking down the jury's finding of lost profits damage, was error because their verdict was supported by sufficient evidence. First, there was evidence of record that the breach by Kelwood, which is unquestioned, caused Washington and Sunday Players to lose profits. And second, because there was evidence of record, and sufficient evidence, on which the jury conclude that those lost profits were reasonably certain. Wasn't the evidence of record that you're talking about based upon the analogy to Under Armour, the use of Under Armour, the yardstick measurement, and so forth? And if that was an inappropriate yardstick, totally inappropriate, then where do you stand without it? If you don't get that. That is the fundamental proof of lost profits damages, and I don't think we have an alternative. We have various sources. You've got to talk. I think you have to focus on why the use of Under Armour as a yardstick was appropriate, and why the expert's determination on that score should stand. Okay. Thank you, Your Honor. The comparison between the business venture formed by Kelwood and Sunday Players to Under Armour brings before this court, as it did before the jury, an uncanny similarity on every respect. Except for length of time. Except for length of time that those two entities, the one before us and Under Armour, had been in existence, right? Correct, literally, Your Honor. Under Armour was founded in 1995 by one former college football player who began selling compression wear out of the trunk of his car. And for several years, he basically had a business on that scale, literally driving from college to college and selling clothing in very small quantities. After his business's entry into a promotion agreement with the television network ESPN, his sales exploded. The expert in this case expressed the opinion that because Sunday Players was able to leap over those first few lean years in which Under Armour was sold out of the trunk of a car, by its entry into the agreement with Kelwood, it achieved a status in terms of market capability, manufacturing capability, quality, design, and all other factors that was equivalent to Under Armour in 2002. He explained the basis for that. What was the, in 2002, what were Under Armour's sales in that year? About $50 million. Okay. And what were the sales that you had prior to this, at the time of this agreement? At the time the agreement was entered into? Yeah. About $190,000. So isn't there some, isn't that a difference? No. Well, it's a difference, but Kelwood had sales of about $15 million of compression wear, and at the time this agreement was entered into, Sunday Players went from a tiny enterprise, selling garments as they could to high schools and small colleges, to a large enterprise. So you're taking over your company, and then all of a sudden you get to get the benefit of the profits and business success that Kelwood has had at that point. You've got a product, and you've got a brand here. And it turns out that when Kelwood took over, nobody recognized this brand. Nobody wanted it. They either were going with Under Armour, or they were going with generic brands and using their own retail names on them, and Kelwood couldn't make any progress for you. That's why they breached the contract. And so I don't see how you get to piggyback on Kelwood's prior success in its other businesses. With respect, Your Honor, because that's not what the evidence showed. The most compelling witness, perhaps, was a third-party witness, Angela Jackson, a woman who was responsible for promoting retail sales at the MTV television network. She personally, along with representatives of Kelwood and Sunday Players, visited major chain retailers who said they were ready to buy Sunday Players and put it in their store as soon as advertising started. That promotion, advertising. You have a chicken and egg problem, don't you, with MTV? Because they weren't going to start advertising until you reached sales of $500,000. No, that's not accurate, Your Honor. I thought that was in the agreement. Well, first of all, there was no finalized agreement with MTV because Kelwood wouldn't sign it. But I thought that they had conditioned. Maybe they hadn't signed it. They had, Your Honor, but the condition was that Ms. Jackson testified that MTV agreed that it would provide $2 million worth in retail cost of $2 million worth of advertising if Kelwood would pay $25,000 to pay the production costs of the advertising. That's an obligation, we submit, that Kelwood had to promote. That's what they agreed to in the license agreement. That's why Sunday Players gave up 95% of their prospective benefit of this venture. Didn't the products compete when they came on the market, did compete or would have competed more fully with the Under Armour product? Again, I say that the resemblance is uncanny. The product is the same except for the label on the garment. The demographic of customers is the same. The promotional approach of getting endorsements from professional athletes is the same, and the time period is approximately the same. So if you're suddenly injecting a product into a market that is, from the get-go, competing with something that is already out there and known, how can you use the company that is already producing the product as a comparator for sales? I mean, that means nationwide—it seems to me, and you can certainly tell me why I'm wrong—nationwide, you are doubling the amount of product that is going out to the market and expecting each to get a 50-50 share of that. Not actually, Your Honor, once you work through the methodology set forth in the report and the testimony. First of all, let me start from the observation that Kelwood's head of this business unit, Mr. Dorff, testified that he believed that he could achieve a 10-15% share of the business that Under Armour was doing. So he would take 10-15% of that business, right? Yes, he would. They're down to 85% of their however many millions. Of their market share. So the way that Mr. Barnes approached that was to say he was going to use the financial performance of Under Armour in 2002 as the starting place of comparable revenues. But for Sunday players, it wasn't going to start in 2002. They hadn't even entered into agreement in 2002. That track of performance instead would begin not when the agreement was entered into, but almost a full year later to account for some kind of ramp-up period for Kelwood and Sunday players. The net effect of that, once you do the arithmetic, is a market penetration substantially less than the 10-15% that Mr. Dorff testified was reasonable. Thank you. Thank you, Your Honor. We've reserved three minutes for rebuttal, so we will hear from Mr. Hirshhorn. Good morning, Your Honor, and may it please the court, James Hirshhorn of Sills, Cummins & Gross for Kelwood Company. I'd like to start by thanking my adversary for his candor in clarifying the issues that are before this court. Sunday players was a new business. The business was compression wear with the Sunday players trademark on it. The problem, which both sides testified to, was how to get this new product into big retailers like Target and Foot Locker. What Sunday players hoped to do was to imitate Under Armour. The problem arises is that, first of all, when Under Armour got started, and it took them eight years to do this, including attaining celebrity endorsements, including sustained promotional efforts, including endorsement deals in Japan, before they had what the plaintiff's expert called their breakout year, Mr. Barnes, the plaintiff's expert, said they're going to do this in one year, where it took Under Armour eight. Second thing is that when Under Armour did it, as the district judge recognized, there was no Under Armour. Sunday players, on the other hand, is coming into a full market. Their problem is not only Under Armour, which dominates the market with a 75% market share. Their problem is that established sporting goods firms had seen this upstart, Under Armour, come from nowhere and create this new business, new market, for a new product. And as Mr. Trugman, our expert, testified, the assumption was that the giants like Nike and Rilakku were simply going to roll over on Under Armour and eat its lunch. That did not happen. Nike, probably the best established sporting goods brand in the world at that time, see, the court is nodding, I don't have to sell Nike here, spent a $30 million ad campaign, and it got them approximately a 2% increase in market share. That's the market environment in which this new business, this new product is being introduced, and that is why the district court concluded that Under Armour was not a proper comparator. Different time, different market. Yes, sir. You mentioned the 75% for Under Armour. The 25% were divided among the retail brands? Yes, among the remaining retail brands and including generic house brands, yes. The second point is that there was nobody here who knew the market. Mr. Barnes was not qualified as a marketing expert. Judge Dollinger, the initial magistrate judge in this case, in his Daubert opinion, held that while Mr. Barnes was qualified as a valuation expert, he was not qualified as a marketing expert. Mr. Barnes assumed that if Kelwood spent a year brand building, then Sunday players would get 50% of what Under Armour had had at a comparable point in its startup or 5% of the compression of their market as a whole. He's standing in the air on that assumption. Somebody had to put bricks under it, and there was no evidence from anybody on the Sunday players' side that that market share or indeed any market share would have been tanked. What you had instead was you had what this court in the Schoenfeld case called the cheerful prognostications of entrepreneurs. Nobody goes into business expecting to fail. Of course Sunday players believed in their own product, but Schoenfeld says that the entrepreneurs' hope and faith are not evidence that a new product will take off. What they needed and they did not have was somebody who knew the industry, somebody who could say as an experienced businessman or as an academic, I have seen new products launched. I know what it takes to get a new brand of clothing into people's hands. Plaintiff's argument was Under Armour took all this time. They made their product cool. If we imitate Under Armour, we could also make our product cool. The problem is that the people who were saying that had never done this before. They were lay witnesses, in particular Mr. Plumlee, whom Sunday players' trial counsel called in his closing argument their marketing expert. Mr. Plumlee was a lay witness. He wasn't identified or qualified as an expert. He had sold established brands of copying machinery for many years. He had never sold clothing. He had never launched a new brand. And for the reasons stated in our brief, he was therefore simply not qualified under Rule 701 and 702 to give a lay opinion about whether or not the strategy of imitating Under Armour would have worked. Now, Mr. Cawley has said that we have an admission from the Kelwood side that Mr. Dorff, the brand manager, if you will, testified that 10 or 15 percent of the market share would be attained. That is not what he testified. First of all, he didn't testify to that. Ms. Jackson from MTV testified as to what he had told her. If it came in at all, it came in as a hearsay admission. Objected to? No, because it was clearly an admission by a party opponent. What he did testify to was he said hypothetically, if he told Ms. Jackson, she said, if they can get 10 or 15 percent of the market, the sky is the limit. Of course, Mr. Dorff is the middle manager whose idea it was to go in. This is during the time of the negotiations, right? This is at the outset. This is before they'd actually tried to get into the market. Yes, and this is before. Thank you, Your Honor. And this is also during the negotiations for the MTV agreement, which, as Mr. Cawley points out. Everybody has rose-colored glasses on at that time, both Kelwood and Sunday Players. As is always the case in new ventures, as in new relationships, everyone is in love. The MTV agreement, which was never signed, was a contingent agreement. MTV was properly skeptical. They, first of all, wanted Kelwood to put up the front money to produce this commercial. Second of all, there was a contingency in there. There was no obligation to broadcast it unless and until there were $500,000 of Sunday Players sales. And third of all, as the district judge pointed out, Ms. Jackson never made a solid comparison with what Under Armour's ESPN campaign had been. She never said how many times this was going to be broadcast. She never said what markets it was going to be broadcast. She never compared the ESPN target audience, which, after all, is a sports-conscious audience, to the MTV audience, which is a more youth and fashion-conscious audience. Even if she had been able to, there's still the $500,000 threshold that has to be met, right? Exactly. That was never achieved. That was never achieved. And all you can say is that MTV also had hope and faith, but it was a highly contingent hope and faith. Your yellow light being on, do you want to address your cross-appeal? Your Honor, the points on the cross-appeal that we think are really significant are twofold. The first, which I think is really covered by our papers, is that if there is a second trial, Mr. Plumlee is not qualified to give opinion as a witness on marketing. The second is that the court should have ruled either as a matter of law or it should have instructed the jury that it could so find if the licensing agreement was ambiguous, that Kelwood's obligation to make marketing efforts for this product was capped at 3%. The obligation to use reasonable marketing efforts, which we all learned in law school in the Lady Duff-Gordon case, is a subspecies of the general New York requirement that there is an implied covenant of good faith and fair dealing in every contract. For the reasons that are cited in our brief, an implied covenant of good faith and fair dealing can be limited by express contract language, and once it is limited by express contract language, it cannot be used to overrule that language. It is our position that the 3% cap was a limit, that there is no other reason to put it in there, and that therefore, at the very least, if the trial court believed that there was some ambiguity, the jury should have been instructed that it had to interpret that provision. Thank you, Your Honor. Thank you. Thank you, Mr. Hirshhorn. Mr. Cawley, you've reserved three minutes. Thank you, Your Honor. First, the Kelwood Sunday Players venture was not a new business. Now, we all know that the concept of a new business in the context of lost profits are something of words of art and that there is a heightened level of scrutiny given to a new business. It obviously presents a far more difficult task in proving lost profits with reasonable certainty. Kelwood was not a new business, and the reason that Sunday Players testified they were willing to give up 95% of the value in this venture is what Kelwood brought to the table that overcame those uncertainties. Kelwood had already sold $15 million worth of compression wear to major retailers, unbranded. Sunday Players entered into this agreement to take advantage of Kelwood's expertise, their 28,000 employees, their billion dollars in revenues, their experience in marketing and promotion, and their contacts with nationwide retailers. It would be a gross oversimplification to simply say that because this business was, quote, new that it deserved the same type of scrutiny that completely ignores the reason for entering into the venture and the value that the alliance with Kelwood brought to Sunday Players. We also heard some discussion of giants in the marketplace, Nike, Reebok, and Adidas, we also heard those weren't successful. And what we didn't hear is that Mr. Barnes, the damages expert, applied a 50% discount to the comparison of revenues with Under Armour attributable to Under Armour's existing presence in the marketplace and the attempts to enter the market by giants like Nike. Now, was the jury, the finder of fact, bound to conclude that that 50% was adequate? Should it have been higher? Should it have been lower? I would submit that as a classic question of fact for the jury and that the jury heard that testimony from Mr. Barnes, they heard the expectation of Mr. Dorff of Kelwood, they heard the cross-examination of the damages expert, and it was within their province to make a fact determination about whether that 50% was too conservative or not conservative enough. The yardstick analysis that Your Honor asked about before, let's be completely clear about the nature of what that means in this case. There is no question in the case that the yardstick is an appropriate methodological analysis. Mr. Trugman, Kelwood's expert, agreed to that. The only question is the two assumptions that the expert, Mr. Barnes, made, the 50% discount and starting with the 2002 curve in 2004. Those are questions of fact. There is ample record in the evidence, not only from the expert, but from fact witnesses to support a jury's verdict awarding their lost profits damages. We request therefore, Your Honor, that this court reverse the JMOL of the trial court, render judgment for the jury's finding of lost profits plus prejudgment interest, or in the alternative, if the court does not grant that relief, that it order a new trial on damages for both lost profits and lost business value. Thank you very much, Mr. Cawley. Thank you both. We will reserve decision in this case.